IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 27, 2004

## STATE OF TENNESSEE v. TIMOTHY RYAN BAGGETT

**Appeal from the Criminal Court for Houston County**
**No. 4567    Allen W. Wallace, Judge**

—————

**No. M2003-02300-CCA-R3-CD - Filed January 5, 2005**

—————

After a jury trial held on January 15 and 16, 2003, the defendant, Timothy Ryan Baggett, was found guilty of one count of rape as charged.  The trial court then sentenced the defendant to ten (10) years as a violent offender at 100% service of sentence.  The defendant appealed to this Court arguing: (1) that there was insufficient evidence to support his conviction; (2) that the prosecutor made improper comments during closing argument that amounted to prosecutorial misconduct; and (3) that in sentencing the defendant the trial court relied upon evidence not in the record.  We have found each of these issues to be without merit and, therefore, affirm the judgment of the trial court, but modify the defendant's sentence to eight years at 100% service of sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed as Modified.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

William B. Locker, III, Public Defender, Ashland City, Tennessee, for the appellant, Timothy Ryan Baggett.

Paul G. Summers, Attorney General & Reporter, Brent C. Cherry, Assistant Attorney General; Dan Alsobrooks, District Attorney General; and Carey Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

1

# FACTUAL BACKGROUND

State's Proof

At the time of the incident, the victim, B.T.[1], lived with her mother and her mother's live-in boyfriend, the defendant. In August of 2001, the family lived in South Carolina, and B.T. made allegations at that time that the defendant put his hand down the victim's pants and put his finger on her vagina, but did not actually digitally penetrate her vagina. The victim's mother refused to believe these allegations, and there was no official investigation by law enforcement personnel in South Carolina.

The family returned to Tennessee shortly after this incident. When they returned, the victim babysat the children of the defendant's brother, John Baggett. On one occasion, John Baggett raped B.T. She told her mother, but once again her mother did not believe the allegations. The victim continued to babysit the children, and according to B.T. John Baggett raped her on multiple occasions. Eventually, the victim stopped fighting John Baggett and began to have consensual sex with him. As a result of this sexual contact, the victim became pregnant and had a son. The victim's son was two (2) years old at the time of trial.

On February 17, 2002, the victim was expected to clean her room. The victim's mother left with the victim's son to go to the victim's grandmother's house. The victim was left alone with the defendant. At this time, according to B.T., the defendant then threw the her on the floor and held his hand over her mouth. He undressed her. The defendant then put his penis in her vagina and had intercourse with her for a few minutes, but withdrew and ejaculated on her stomach. After he finished, he told the victim to get up and take a shower. She went into the bathroom, got dressed and climbed out of the window. At the time of the attack, she had on overalls with bleach stains and a Winnie-the-Pooh and Tigger t-shirt. She did not shower before dressing.

After the B.T. climbed out of the window, she ran to her landlords' house. The landlords were a couple who were like grandparents to her. The defendant soon arrived at the landlords' house and called the victim's mother to tell her to come home. The victim's mother arrived at the house about 30 minutes later. When the victim told her mother what happened, her mother punched B.T. in the face, resulting in a bruise. B.T.'s mother stated that she did not believe B.T.

---

[1] It is the practice of this Court to refer to minor victims by their initials instead of their names. We will refer to the victim in this case by her initials because she was a minor at the time of the rape.

After Kathy Imbush, B.T.'s friend's mother, alerted the authorities, Investigator David Hicks interviewed the victim, her mother, the victim's friend, Sarah Imbush, and her mother, Kathy Imbush. Based on the information he received from these interviews, Investigator Hicks asked Deputy Wilson Cofelt to recover the overalls and a Winnie-the-Pooh shirt. The victim's clothes were subsequently sent to the TBI crime lab. Investigator Hicks spoke with the victim on February 19 and did not request a rape kit because it had been two days since the rape. Officer Stewart Goodwin interviewed the defendant on February 19, 2002, at the Sheriff's Office after reading the defendant his Miranda Rights. The defendant gave a statement, wrote it out and signed it. The defendant's handwritten statement was:

> Jean Tidwell [the victim's mother] had marked me with a magic marker as well as a pen on my private part on the top marker was a line and ink pen was a X. this [sic] was on 17th. The purpose for the marks was we had this trouble before and her mom "Jean" wanted to be safe. After this was supposed to happen I [sic] showed Dave Koths the marks and also Jean and they were still there in Jeans [sic] writing.

Special Agent Margaret Bash of the Tennessee Bureau of Investigation ("TBI") crime lab found sperm cells on the crotch area of the victim's overalls. She did not find any semen on the t-shirt. She requested a blood sample from the defendant to compare the DNA. After testing the DNA from the semen on the victim's overalls and the DNA from the defendant's blood sample, Special Agent Bash concluded that the probability was one in six billion that the semen found on the victim's overalls did not belong to the defendant. In response to a question asked by the defendant's attorney, Special Agent Bash stated that it was possible for semen on a wash rag to have been transferred to the overalls. However, one ordinarily expects semen on the crotch of clothing to be the result of drainage of the semen from the vagina due to gravity. On redirect, Special Agent Bash stated that a man can ejaculate at the same time he withdraws.

### Defendant's Proof

Sarah Imbush spoke with the victim on February 17, she guessed that the victim had been raped by the defendant because B.T. told Miss Imbush before February 17 that the defendant had been touching her. Another reason Miss Imbush guessed the victim had been raped was because the victim's mother came to church, and B.T.'s mother never came to church with B.T. B.T. told Miss Imbush that her landlady had taken her to the hospital on Saturday. The landlady denied this statement. On the Tuesday after the rape, the victim told Miss Imbush that the father of her baby is the defendant's brother. The victim asked her to keep the rape a secret.

On February 17, the victim's mother went to her mother's house to take glasses to her son who was living over there. While she was there, the defendant called her and told her that B.T. had "done this again." Before B.T.'s mother had left the house to go to her mother's, she marked the defendant's penis with an ink pen because she did not want B.T. "lying on him." The victim had accused the defendant of sexual assault when they lived in South Carolina. After B.T.'s mother arrived at the landlords' house, the defendant took her into the bathroom to show her the ink pen

mark on his penis. It was still there. Shortly thereafter, B.T., B.T.'s mother and the landlady went to the Dollar Store. B.T.'s mother did not say anything else to the victim about the rape accusations that day. They returned home from the Dollar Store and went to church. On Tuesday, February 19, the police called and asked them to come to the station. According to B.T.'s mother, the victim's clothes were in the hamper when the police came to get the clothes. B.T.'s mother also stated that she and the defendant had had intercourse on Sunday and Tuesday. After they had intercourse, B.T.'s mother had cleaned off with a wet wash rag and put it in the hamper. B.T.'s mother stated that at that time the victim's clothes were definitely in the hamper, not on the floor.

On cross-examination, B.T.'s mother admitted that she had been to the church three or four times from August 2000 to February 2002. At the time of the trial, B.T.'s mother and the defendant had been together for ten (10) years. When B.T.'s father became bed-ridden in the 1990's, the defendant moved in with B.T.'s mother to help her care for her husband. The defendant also helped her care for the kids. The defendant's brother came to visit often because he was married to B.T.'s mother's sister. B.T.'s father died in 2000, and the defendant stayed with B.T.'s mother. However, she denied having a romantic relationship with the defendant until after her husband died. B.T.'s mother admitted that she really depends on the defendant financially, emotionally and to help around the house.

The State also cross-examined B.T.'s mother about the events on the date in question. Concerning the pen mark, B.T.'s mother testified that she made an "X" on the defendant's penis. This was the first occasion she had marked his penis with a pen. The defendant asked B.T.'s mother to make a mark on his penis because he did not want the victim to lie about him again. B.T.'s mother then said that the victim had never complained about the defendant or accused him of touching her before this incident. Immediately after making this statement, B.T.'s mother admitted that the victim had told her something had happened when they lived in South Carolina.

B.T.'s mother graduated from what she called "slow learner high school." She cannot read or write. She could not understand some of what was happening at trial. The State introduced a psychological examination at trial that stated B.T.'s mother has limited communication skills and limited memory skills.

Kathy Imbush is the mother of B.T.'s ex-boyfriend and Sarah Imbush, who was a good friend of the victim's. When B.T. and Mrs. Imbush's son were dating, the defendant and B.T.'s mother gave Mrs. Imbush's son a condom for Christmas as a gift. B.T. later told Mrs. Imbush about ongoing sexual behavior with both the defendant and his brother.

The defendant was indicted on May 6, 2002 for one (1) count of simple rape. A trial was held January 15 and 16, 2003. After hearing the evidence, the jury found the defendant guilty of one count of rape as charged. The trial court held a sentencing hearing on March 10, 2003. The trial court sentenced the defendant to ten (10) years with service of 100% of his sentence. The defendant filed a notice of appeal on July 25, 2003.

4

## ANALYSIS

The defendant argues three issues in this appeal: (1) Whether the evidence was sufficient to convict the defendant of rape; (2) whether the prosecutor made statements in final argument that amount to prosecutorial misconduct; and (3) whether the trial court considered evidence other than evidence on record at the sentencing hearing.

### Sufficiency of the Evidence

The defendant's first argument is whether there was sufficient evidence to support his conviction. When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

The defendant was convicted of rape. The crime of rape is found at Tennessee Code Annotated section 39-13-503 and is defined as the:

> [U]nlawful sexual penetration of a victim by the defendant . . . accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act; (2) The sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent; . . . .

When viewing the above evidence in a light most favorable to the State, there is ample evidence to support the defendant's conviction. B.T. testified that the defendant had nonconsensual sexual intercourse with her. The jury obviously accredited the victim's testimony. Questions regarding the credibility of the witnesses, the weight and value of the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. State v. Davidson, 121 S.W.3d 600,

5

614 (Tenn. 2003). In addition, there was very persuasive DNA evidence. Special Agent Bash testified that she found semen on the crotch of the victim's overalls. There was a six million to one probability that the DNA contained in this sample was not the defendant's. We determine that the B.T.'s testimony coupled with the DNA evidence supports the jury's conclusion that the defendant was guilty of rape.

## Prosecutorial Misconduct

The defendant's second issue is that the prosecutor made several inappropriate comments in his closing argument. The majority of the comments upon which the defendant bases his appeal did not elicit an objection at trial. In addition, this issue was not raised in the motion for new trial. We first address the statements to which the defendant did not object at trial or did not raise in his motion for new trial.

### Statements With No Objection

Typically when a prosecutor's statement was not the subject of a contemporaneous objection, the issue is waived. Tenn. R. Crim. P. 33 and 36(a). State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999); State v. Green, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Thus, if this Court is to review the claims of prosecutorial misconduct we must do so through the process of "plain error" review embodied in Tenn. R. Crim. P. 52(b) which provides:

> An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice.[2]

This Court has, in its discretion, from time to time reviewed allegations of prosecutorial misconduct as "plain error" even in the absence of a contemporaneous objection. See, e.g., State v. Marshall, 870 S.W.2d 532 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Carter, 988 S.W.2d 145 (Tenn. 1999) (determining in absence of objection that prosecutor's jury argument was not plain error); State v. Butler, 795 S.W.2d 680 (Tenn. Crim. App. 1990) (considering whether statements of prosecutor were plain error despite lack of objection by defendant); Anglin v. State, 553 S.W.2d 616 (Tenn. Crim. App. 1977) (determining that in order to justify reversal on the basis of improper argument and remarks of counsel in absence of objection, it must affirmatively appear that the improper conduct affected the verdict to the prejudice of the defendant).

---

[2]This rule by its terms allows plain error review only where there is a failure to allege error in the new trial motion or where the error is not raised before the appellate court. Nevertheless the rule has been interpreted by the appellate courts to allow appellate review under some circumstances in the absence of a *contemporaneous objection* as well.

In exercising our discretion as to whether plain error review under Tenn. R. Crim. P. 52(b) is appropriate, the Tennessee Supreme Court has directed that we examine five factors: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (citing State v. Adkisson, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994)). All five (5) factors must be present for plain error review. Smith, 24 S.W.3d at 283.

For a "substantial right" of the accused to have been affected, the error must have prejudiced the appellant. In other words, it must have affected the outcome of the trial court proceedings. United States v. Olano, 507 U.S. 725, 732-37 (1993) (analyzing the substantially similar Fed. R. Crim. P. 52(b)); Adkisson, 899 S.W.2d at 642. This is the same type of inquiry as the harmless error analysis under Tenn. R. App. P. 36(b), but the appellant bears the burden of persuasion with respect to plain error claims. Olano, 507 U.S. at 732-37.

There were several comments made by the prosecutor during closing argument that the defendant now complains of to which he did not object at trial.[3] The defendant states that the prosecutor asked the jury to consider that a prior allegation against the defendant had been proven true and that the victim was scared to death of the defendant and her mother. The statement made by the prosecutor is as follows:

> Now defense, I'm sure, because you've already seen by the tenor of the testimony they've offered, they're going to tell you that was a false allegation. Well I don't know whether that was false or not, but I guarantee you that if you listened closely to [the victim's] testimony about what happened you won't believe that was a false allegation, it just was never reported. Why was it never reported? Because [the victim] is scared to death of [the Defendant] and her mother, that's why it was never reported. Why did she not want to go to the authorities when this was reported? Because she's scared to death of [the Defendant] and her mother . . . .

The defendant also complains that the prosecutor made a statement, "in a highly inappropriate attempt to elicit sympathy and introduce evidence of unsubstantiated years of abuse and referring to the years of hell and referring to the victim as 'poor girl'." The statement made by the prosecutor is as follows:

> Can you imagine the hell this poor girl has lived through for three years or more? We don't know when this started. She was raped by John Baggett [the

---

[3]We note that the Defendant's citations contained in his brief to the statements complained of in the record do not match up with the transcript provided to the Court. The Defendant did not quote these statements in his brief, but instead cited to their location in the record. Therefore, the specific lines the Defendant cites to in the record are not the statements described in his brief. We have attempted to locate the statements to which he objects and will base our analysis the statements we have identified.

7

Defendant's brother] so many times she tells you that she just gave up. She quit fighting him. It became consensual. At the age of 15 she had a baby. Fifteen year old girl in Special Education class at Houston County High School is saddled with a baby because her mother wouldn't take care of her, because her mother's fiancee wouldn't take care of her and this poor child has to try to make it through life on her own in those circumstances. Can you imagine? Can you imagine?

The defendant also complains that the prosecutor improperly and with no legitimate purpose made reference to the defendant not testifying. The prosecutor's statement was:

[The defendant's attorney] told you during voir dire, and it's absolutely true, the defense has no obligation to put on any proof whatsoever. The defendant can choose not to testify as [the Defendant] has done and you are not to hold that against him or consider it whatsoever. And the defendant can sit on his hands and do nothing and sit back and let the state do their job. And, ladies and gentlemen, in this case the state had done its job and the defense has put on proof for you to consider. And when the defense does put on proof for you to consider, it is under just as much scrutiny as anything the state puts on.

The defendant also argues again that the prosecutor argued evidence that was not proven in an attempt to gain sympathy from the jury:

We know how her mother reacts when [the victim] tells things about what happened to her, when she tells about what happened to her, when she tells about the sexual abuse that she had endured over the years, when she tells about [the Defendant's] brother John who was allowed to come and go apparently at will and have sexual contact with this girl who had endured it so long that she just gave up and began consenting to it.

The defendant also complains that the prosecutor improperly commented that the defendant was putting up a "huge smoke screen." The prosecutor's statement was as follows:

So you can shotgun as a good defense lawyer will do, you can put up a huge smoke screen and say this could have happened, that could have happened, the state could have done this, the sheriff's office could have done that.

The defendant also argues that the prosecutor made the following statements to elicit sympathy from jury:

Focus on what the proof was, not what it wasn't. Focus on what you know and then ask if that makes sense. Does it make sense? Yes. Over a period of three years this girl was sexually abused? She had a baby at the age of 15 years old by that

8

man's brother. That doesn't make him guilty of anything and I'm not suggesting that it does, but it explains a whole lot about her behavior, doesn't it?

It explains a whole lot, yet she wanted to reach out, she wanted to tell somebody, by God she wanted some help from her friends.

The defendant also complains about comments on the morals of the victim's mother and the defendant for giving the victim's boyfriend a condom. The defendant also complains that the prosecutor went on to talk about the prosecutor's own experiences dating in high school and how the partents of the girls the prosecutor dated never gave him a condom.

Finally, the defendant argues that the prosecutor made many assorted improper comments that are objectionable. These include when the prosecutor stated that going to the Dollar Store after the rape occurred was "probably to her heaven," referred to the victim as "poor young lady, and the prosecutor's improper reference to God when the prosecutor said, "Well she made some prior inconsistent statements? Good Lord, God."

We now turn to the five factors set out by the Tennessee Supreme Court to establish plain error review. The first factor is that the record must clearly establish what occurred in the trial court. The defendant has met this factor. There is an ample record of the defendant's trial. The second factor is that a clear and unequivocal rule of law must have been breached. In this case the rule of law that is alleged to have been breached is that of prosecutorial misconduct. A prosecutor's argument must be temperate. For an appellant to be successful on a prosecutorial misconduct claim, he must prove that the prosecutor's conduct was "so inflammatory that it affected the verdict to the Appellant's detriment." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). We conclude that evidence of guilt was substantial enough that the verdict was not affected by the prosectuor's conduct. The third factor is that a substantial right of the defendant must have been adversely affected. As stated above, for a substantial right of the accused to have been affected, it must have affected the outcome of the trial court proceedings. This is essentially the same requirement as that required to find prosecutorial misconduct. As we have already stated, we conclude that the prosecutor's statements did not affect the outcome of the trial. The fourth factor is whether the defendant waived the issue for tactical reasons. Given the number of allegedly improper prosecution comments we believe it likely that the defendant did not object because he did not want to continually jump up and object throughout the prosecutor's closing argument. This is a tactical decision. The fifth factor is that consideration of the error is necessary to do substantial justice. We find that review of this issue under plain error is not necessary to do substantial justice.

When viewing the defendant's allegations of prosecutorial misconduct as to the above statements under plain error review, we conclude that the defendant has not demonstrated the factors required.

Therefore, review of these allegedly improper comments is waived.

<u>Statements Objected to at Trial</u>

We now turn to the statements made by the prosecutor to which the defendant objected at trial. The defendant objected to the prosecutor's statement that the victim was retarded:

> [Prosecutor]: Stop and think about that for just a second. Now I know there's been a lot of talk about the limited intellectual capacity of these parties, and granted that is true. And I don't mean to offend any of them by that, but it's just true. [The victim] is mildly mentally retarded and her mother Jean is mildly mentally retarded, but they're not stupid. It's not like they don't have walking around sense. I mean let's think about that for a second.
> [Defendant's attorney]: You Honor, I will object to the statement that they were mildly mentally retarded. There's no proof that either of them were. I mean the jury can judge from their own observation as to their intelligence. There's no proof that they're retarded.
> [Prosecutor]: I'm sorry. I believe [Defendant's attorney] introduced proof that [the victim's mother] was.
> [The Court]: He did. You can argue inferences drawn from the proof. Go ahead.

The defendant also objected to the following statement by the prosecutor:

> [State]: That man not only intentionally raped her, he planned it, he premeditated it and he set up his defense before he ever did it, as weak as it was that's what he was doing. I've never heard of anybody so terrible. I've also never heard of anything so horrible. A 17 year-old girl had to hear that 16 year-old, 15 year-old, we don't know how long it's been. She had nobody to talk, without a parent that would help her, without a mother that would believe her and go to the authorities, except to threaten. She was reaching out when she talked to Sarah and Ms. Imbush. She was reaching out, ladies and gentlemen, and she was reaching out to you.
> [Defendant's attorney]: Objection
> [Trial Court]: I sustain the objection

In <u>State v. Goltz</u>, 111 S.W.3d 1 (Tenn. Crim. App. 2003), this Court stated:

> Our supreme court has long recognized that closing argument is a valuable privilege for both the State and the defense and have allowed wide latitude to counsel in arguing their cases to the jury. <u>State v. Cauthern</u>, 967 S.W.2d 726, 737 (Tenn. 1994). Trial judges in turn are accorded wide discretion in their control of those arguments, <u>State v. Zirkle</u>, 910 S.W.2d 874, 888 (Tenn. Crim. App.1995), and this discretion will not be interfered with on appeal in the absence of abuse thereof. <u>Smith v. State</u>, 527 S.W.2d 737, 739 (Tenn. 1975). Notwithstanding such, arguments must

10

be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law. Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App.1995). We are mindful of the oft quoted principle that a prosecutor must be free to present his arguments with logical force and vigor, "[b]ut, while he may strike hard blows, he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

When argument is found to be improper, the established test for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment. Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965). In measuring the prejudicial impact of any misconduct, this court should consider: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

Goltz, 111 S.W.3d at 5.

The two statements complained of by the defendant were both objected to by the defendant at trial, so we must now determine whether there was an abuse of discretion on the part of the trial court. When the defendant objected to the statement concerning the mental capacity of the victim and her mother, the trial court stated that the argument was acceptable because the prosecutor could argue inferences from the proof. In his brief, the defendant objects to the statement specifically with regard to the victim. There was no specific evidence in the trial that the victim was mildly mentally retarded. However, when asked what type of classes she took in high school the victim replied that she took special education classes and she took them for a long time. The trial court stated at the time of the objection that the State could argue inferences from the proof. The fact that the victim was taking special education classes definitely calls into question the victim's mental capabilities.

Although there was no specific evidence that the victim was mildly mentally retarded, this statement by the prosecutor does not meet the five factors required to find reversible error. Under the facts and circumstances of the case, as stated above there was evidence to question the victim's mental capabilities, and as the defendant's attorney stated upon his objection, the jury was in a position to judge the intelligence of the victim and ignore the prosecutor's statement if the members of the jury believed otherwise. The trial court took no substantial curative measures. We do not believe that the prosecutor intentionally misled the jury. There had been evidence that the victim's mother was mildly retarded and there was evidence that the victim had to take special education classes. We also do not find cumulative errors with regard to improper conduct such that the outcome of the trial was affected. We also conclude that the evidence presented by the State was

11

strong enough that the outcome of the trial was not affected by the presence of this statement in the State's closing argument.

With regard to the second statement, the defendant argues that the prosecutor was attempting to elicit emotion and sympathy from the jury. This appeal to the jury was an improper statement. The trial court immediately sustained the defendant's objection. However, we do not believe that this statement was so prejudicial that it affected the verdict. The facts and circumstances of this case are disturbing, and there was very compelling evidence presented concerning the victim's situation. The trial court did sustain the objection without further discussion. The intent of the prosecutor was probably to elicit sympathy, but this statement was not overly inflammatory even in the face of it being improper. As we stated above, we do not find that there is a cumulative prejudicial effect from other improper arguments, and we also believe that the evidence presented in this case strongly supports the verdict handed down by the jury.

For the above reasons, we do not find that the trial court abused its discretion in its treatment of the prosecutor's statements to which the defendant objected at trial. This issue is without merit.

## Sentencing

The defendant's final argument is that the trial court erred in sentencing the defendant when it relied upon evidence that was not of record. "When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

Neither the Defendant nor the State make any arguments concerning the validity of the Defendant's sentence under the United States Supreme Court's recent decision in Blakely v. Washington, 542 U.S. ___, 124 S.Ct. 2531 (2004). Prior to the release of Blakely, in order to determine a defendant's sentence, a trial court started at the presumptive sentence, enhanced the sentence within the range for existing enhancement factors, and then reduced the sentence within the range for existing mitigating factors in accordance with Tennessee Code Annotated section 40-35-210(e). No particular weight for each factor is prescribed by the statute; the weight given to each factor is left to the discretion of the trial court as long as it comports with the sentencing principles and purposes of our Code and as long as its findings are supported by the record. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995). This Court has recently recognized that

12

*Blakely* "calls into question the continuing validity of our current sentencing scheme." State v. Julius E. Smith, No. E2003-01059-CCA-R3-CD, 2004 WL 1606998, at *4 (Tenn. Crim. App. at Knoxville, July 19, 2004); see also State v. Michael Wayne Poe, No. E2003-00417-CCA-R3-CD, 2004 WL 1607002, at *9 (Tenn. Crim. App. at Knoxville, July 19, 2004).

Because we believe that the decision in Blakely has compromised the validity of Tennessee's current sentencing scheme we have determined that we must analyze the Defendant's sentence under Blakely sua sponte. Because this issue was not raised by the Defendant, the only way the issue may be addressed is through a plain error analysis. As we have stated above, in exercising our discretion as to whether plain error review under Tenn. R. Crim. P. 52(b) is appropriate, the Tennessee Supreme Court has directed that we examine five factors: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (citing State v. Adkisson, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994)). All five (5) factors must be present for plain error review. Smith, 24 S.W.3d at 283.

For a "substantial right" of the accused to have been affected, the error must have prejudiced the appellant. In other words, it must have affected the outcome of the trial court proceedings. United States v. Olano, 507 U.S. 725, 732-37 (1993) (analyzing the substantially similar Fed. R. Crim. P. 52(b)); Adkisson, 899 S.W.2d at 642. This is the same type of inquiry as the harmless error analysis under Tenn. R. App. P. 36(b), but the appellant bears the burden of persuasion with respect to plain error claims. Olano, 507 U.S. at 732-37.

In Blakely, the Supreme Court determined that the "statutory maximum" sentence for Apprendi[4] purposes is "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 542 U.S. at ___, 124 S.Ct. at 2537. In other words:

> [T]he relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

---

[4] In Apprendi v. New Jersey, 530 U.S. 466 (2000), the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. In Ring v. Arizona, 536 U.S. 584, 587 (2002), the Court applied Apprendi to hold that because Arizona conditioned eligibility for the death penalty upon the presence of an aggravating fact that was not an element of first degree murder, the Sixth Amendment guaranteed the defendant a right to a jury determination of that fact.

Id. Blakely involved the sentencing scheme of the State of Washington where the criminal code establishes maximum sentences for felonies according to the class of felony. Washington also has presumptive sentencing ranges based on the seriousness level of the offense and the offender's criminal history. In Washington, a judge is permitted to impose a sentence above the presumptive range when there exists "substantial and compelling reasons justifying an exceptional sentence." Blakely, 542 U.S. at ___, 124 S.Ct. at 2535. A judge may impose an exceptional sentence utilizing one of these "reasons" illustrated in the Sentencing Reform Act only if it is not already taken into account in the calculation of the presumptive range.

Blakely pled guilty to second-degree kidnapping with a firearm. As a Class B felony, it was punishable by a sentence of up to 10 years. The Sentencing Reform Act of Washington, however, specified a presumptive range of 49 to 53 months. The sentencing judge imposed an exceptional sentence of 90 months on the ground that the defendant had acted with "deliberate cruelty," a statutorily enumerated ground for upward departure. The Supreme Court ultimately determined that Washington's sentencing procedure violated the defendant's Sixth Amendment right to a trial by jury. Id. 542 U.S. at ___, 124 S.Ct. at 2538.

This Court has acknowledged that Blakely "extended Apprendi's holding that, under the Sixth Amendment, a jury must find all facts used to increase a defendant's sentence beyond the statutory maximum." See State v. Charles Benson, No. M2003-02127-CCA-R3-CD, 2004 WL 2266801, at *8 (Tenn. Crim. App. at Nashville, Oct. 8, 2004). In so doing, this Court went on to state that:

> [N]othing in Apprendi suggested that the phrase "statutory maximum" equated to anything other than the maximum in the range. To the contrary, the United States Supreme Court stated the issue in Apprendi as "whether the 12-year sentence imposed . . . was permissible, given that it was above the 10-year maximum for the offense charged in that count." 530 U.S. at 474, 120 S.Ct. at 2354. We also note that the Supreme Court has considered the retroactive effect of the holding in Ring v. Arizona 536 U.S. 584, 592-93, 122 S.Ct. 2428, 2435 n.1, 153 L.Ed. 2d 556 (2002), as a new rule for capital cases even though it was based on Apprendi. See Schriro, ___ U.S. at ___, 124 S.Ct. at 2525-27. . . . We conclude that Blakely alters Tennessee courts' interpretation of the phrase "statutory maximum" and establishes a new rule in this state. . . .

Id. at *8.

We now turn to the five factors required for plain error review. The first factor, the record must clearly establish what happened at trial, has been met. The second factor, a rule of law must have been violated has been met. As stated above, Blakely has led to the establishment of a new rule of law. The third factor has been met because it is without question that a new rule being established for sentencing affects a substantial right of the Defendant. The fourth factor, the defendant did not

14

waive the issue for tactical reasons has been met.  Finally, the fifth factor has been met because review of this issue is clearly necessary to do substantial justice.  All five factors are present.  Therefore, we find that plain error has occurred, and this issue must be addressed.

The trial court relied on several enhancement factors when determining the Defendant's sentence.  As stated above, a new rule was stated in <u>Blakely</u> and only enhancement factors that are reflected in the jury verdict or admitted by the Defendant may be used to enhance the Defendant's sentence.  <u>Blakely</u>, 542 U.S. at ___, 124 S.Ct. at 2537.  The trial court relied upon the following enhancement factors: (2) previous history of criminal convictions or criminal behavior;(5) victim was particularly vulnerable because of age or physical or mental disability; (8) the offense was committed to gratify the Defendant's desire for pleasure or excitement; (9) previous unwillingness to comply with the law probation violation several years ago; and (16) the defendant abused a position of private trust.  Tenn. Code Ann. § 40-35-114 (2), (5), (8), (9), & (16).  Under the <u>Blakely</u> guidelines, (5), (8) and (16) clearly violate <u>Blakely</u>, because these enhancement factors are not included in the jury's verdict and the Defendant has not admitted them.

At the sentencing hearing, the Defendant himself testified to having his probation revoked and having previous criminal convictions.  Therefore, enhancement factors (2) and (9) do not violate <u>Blakely</u>.  However, when considering these factors, the trial court did not put much weight on them because the Defendant's probation violation and the majority of his prior arrests were in the early 1990's.  We also conclude that these enhancement factors do not carry much weight in the Defendant's situation and cannot support the enhancement of the Defendant's sentence from the statutory minimum.  Therefore, we must modify the Defendant's sentence to the statutory minimum of eight (8) years down from ten (10) years as determined by the trial court.

## **Conclusion**

For the reasons stated above, we affirm the judgment of the trial court.

_____
JERRY L. SMITH, JUDGE

15